# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

Sandra R. Gottstein,

                Plaintiff,

      v.

Nancy A. Berryhill,
Acting Commissioner of
Social Security,

              Defendant.

Civil Action No. 3:18-1364

(Judge Mannion)

---

## MEMORANDUM

### I. Procedural Background.

We consider here the appeal of Plaintiff Sandra Gottstein from an adverse decision of the Social Security Administration ("Agency") on her application for disability insurance benefits ("DIB"). Plaintiff's claim was denied at the administrative level on April 20, 2015 whereupon she requested a hearing before an administrative law judge ("ALJ"). On March 3, 2017, Plaintiff received a hearing before ALJ Daniel Balutis in Wilkes-Barre, Pennsylvania. The ALJ issued an unfavorable Notice of Decision on May 26, 2017 and Plaintiff then requested review by the Appeals Council. The Appeals Council denied Plaintiff's request and that denial constitutes a "final

decision" by the Agency that vests this Court with jurisdiction pursuant to 42 U.S.C. § 405 (g).

## II. Testimony before the ALJ.

At the hearing of March 3, 2017, Plaintiff testified along with vocational expert ("VE") Patricia Chilleri. Plaintiff was represented at the hearing by Attorney Susan Tetrick Lynch. The testimony may be summarized as follows.

### a. Plaintiff's Testimony.

Plaintiff resides in Bloomsburg, Pennsylvania. She was fifty years of age on the date of the hearing, stood five-feet six inches tall, and weighed two hundred pounds. Her weight had been stable for some time. She is right hand dominant. She has an unrestricted driver's license and does drive. She is a high school graduate, speaks and writes English, and has no problem doing basic arithmetic or managing her money. Plaintiff has had no post-high school education or vocational training. (R. 40-43).

Plaintiff worked for the Geisinger Health Care System for approximately twenty years as a medical transcriptionist. For the last sixteen years of her employment with Geisinger she worked remotely from her home. She last worked on June 30, 2013. Her job involved transcription of medical notes and was performed while seated. The job did not involve lifting or

carrying anything that weighed even as much as ten pounds. She had no supervisory responsibility. (R. 44-46).

As she sat in the hearing, Plaintiff was in slight discomfort because her hips ached. She described the pain as level four on a scale of one to ten. The hip pain is with her every day. The pain can usually be controlled by taking Aleve or something of that nature. She is in some degree of discomfort ninety percent of the day. She also has pain in her feet and ankles which is present every day. The pain in her feet and ankles is similar in intensity to that in her hips. The pain in her feet and ankles is with her about fifty percent of the day. Her most extreme pain is in the knee that she injured in a fall in her home. Her knee pain is present every day and taking Aleve does not really control it. (R. 47-49).

Plaintiff estimates that she can walk about one hundred feet on an average day before exacerbating the pain in her legs and ankles. To traverse one hundred feet she would need to use a cane. After walking one hundred feet she would need to sit and rest for twenty minutes before walking further. She can stand with the aid of a cane for approximately fifteen minutes before her pain increases and her legs stiffen. At that point she would need to sit and rest for twenty minutes before standing again. Without her cane for support she would be unable to stand for more that two minutes. She can sit

for thirty minutes before her hip pain increases and she must then stand to alleviate the pain. After standing for fifteen to twenty minutes she would be able to sit again. (R. 47-54).

Plaintiff can lift a gallon of milk but would have difficulty with a ten pound bag of sugar. She would be unable to walk and carry even a gallon of milk simultaneously because of instability in her legs. She can push and pull with her arms and hands, bend at the waist, and climb a few steps. She would not be able to climb a flight of stairs without resting on the way up and it is too difficult for her to climb from one floor to another. (R. 55-57).

Plaintiff believes that her spinal muscular atrophy is the reason she cannot work. She does read the local newspaper and does not have a problem understanding and remembering what she reads. She uses a lap-top computer for occasional online shopping and email. She is able to dress herself and take care of her personal hygiene. She makes simple meals three to four times a week. She does require some assistance when cooking if she needs to use a heavy utensil or get anything heavy out of the oven. She cannot stand for an extended period of time in the kitchen. She goes shopping for groceries about four times each month but experiences difficulty bending to place things in a cart or to take things out of a cart. The grocery store workers help her get heavy items to the car. While she can do the

grocery shopping with some assistance from others, a grocery shopping trip leaves her fatigued. She can do laundry with assistance in getting clothes out of the dryer. She does not sweep or vacuum nor does she do yard work of any kind. She can use the upper rack of her dish washer but cannot access the lower rack due to her difficulty with bending. (R. 58-65).

Plaintiff has two children aged twenty-seven and twenty-three. The younger child resides with her. She normally goes to bed around 10 p.m. and rises at about 7:30 a.m. During that nine and one half hour period she estimates that she sleeps for five to six hours. She awakens four or five times each night to change position. She occasionally naps for about one hour during the day. (R. 66-67).

When Plaintiff worked as a medical transcriptionist she did so without adaptations. As her condition worsened she went from eight hour days to five hour days and decreased the number of shifts from five to four each week. She had to obtain a special foot pedal to accommodate problems with her foot. Also, just prior to the time she began working from her home, she was allowed an extra fifteen minutes of break time each day. She had been having a problem with swelling in her right ankle which made it difficult for her to drive. Also, both her feet are expanding and her toes are curling upward. She must buy shoes that are a size too large to accommodate this

problem. The larger shoes make her more comfortable but also make her less steady on her feet. Her home is a bi-level with a landing at the front door, six steps leading to the lower level, and six steps leading to the upper level. To go up the stairs she must grip the railing with both hands and pull herself along or crawl up on her hands and knees. It has been years since she was capable of walking up a full flight of stairs "one foot after the other". When people visit her family she usually gathers near the landing and talks to people gathered in the living room above. Her home "isn't working for me very well anymore." She doesn't think she will be living in the home much longer. She can function much better in her family's second residence in Florida because it is all on one level. (R. 68-76).

Plaintiff has been using a raised toilet seat for years and must hold onto the top of the shower when showering in order to maintain balance. She cannot wash below her knees and sits on the toilet with her feet in a bucket in order to cleanse her feet. She must be seated to dress herself and it is a time consuming process. She needs to rest for five to ten minutes after dressing. She does not shower every day because it simply makes her too tired. She dreads going to any social event because she has difficulty moving and cannot use the bathrooms in some venues properly. (R. 77-80).

Her family had taken vacation cruises for approximately fifteen years but the last one they took had been too difficult for her. She cannot climb the steps to get on a bus or walk well enough to ambulate around an airport. She will get wheelchair assistance in an airport because she cannot walk safely on airplane boarding ramps. She does not go out to socialize in her friends' homes any longer because of her mobility issues. (R. 81-82).

### b. Testimony of Patricia Chilleri, VE.

Ms. Chilleri testified that she was familiar with the Dictionary of Occupational Titles and that her testimony would track that treatise unless she indicated to the contrary. She stated that she was familiar with Plaintiff's occupational history and that the Plaintiff should be considered as a person "closely approaching advanced age" under the Agency's regulations. She described Plaintiff as a person "with extremely consistent work history" from 2002 through her alleged onset date in June of 2013. Plaintiff's relevant work was classified as "sedentary and unskilled". (R. 85-86).

The ALJ asked Ms. Chilleri a hypothetical question in which she was asked to assume an individual the same age, vocational background, and education as the claimant. She was also to assume that the hypothetical individual was restricted to a sedentary exertional level with the following additional restrictions: she required a cane in her dominant hand for all

standing and walking; after every thirty minutes of sitting the hypothetical individual would be required to stand for five minutes; after every twenty minutes of standing the hypothetical individual would be required to sit for five minutes; after twenty minutes of walking she would be required to sit for five minutes; she would have to reach bilaterally only occasionally; she would never crawl and never climb ladders, ropes, or scaffolds; all remaining postural movements would be occasional to include the climbing of ramps and stairs, balancing, stooping, kneeling, and crouching; she would have frequent exposure to unprotected heights and moving mechanical parts; she would have frequent exposure to humidity and wetness and dust, odor, fumes, vibrations, and loud noise. Based upon the hypothetical person's supposed abilities, the VE stated that such a person would be unable to perform the claimant's past relevant work because the frequent changing of positions and alternating between standing and sitting would require her to be off task too much to maintain employment as a transcriptionist. However, due to the transferability of other clerical skills claimant had acquired in her previous employment, Ms. Chilleri indicated that she would be capable of performing three sedentary jobs that do exist in significant numbers in the national economy, mainly: information clerk, receptionist, and records clerk. On questioning by Plaintiff's attorney, Ms. Chilleri also stated that a person

who would be off task thirty percent of a workday due to a deteriorating muscular condition would not be able to sustain employment of any kind. (R. 89-101).

## III. Relevant Medical Evidence.

### a. Karl O. Luxardo, D.O.

Dr. Luxardo was Plaintiff's primary treating physician from at least July of 2015 through March of 2017. The record does not include a catalog of how often Dr. Luxardo saw Plaintiff or a compilation of his treatment notes. The record does contain three documents completed by Dr. Luxardo. The first of these is a Muscular Dystrophy Treating Physician Data Sheet prepared on July 20, 2015. (R. 416-423). Dr. Luxardo indicates that Plaintiff suffers from a type of muscular dystrophy know as spinal muscle atrophy ("SMA"). He indicates further that this diagnosis was confirmed by electromyography. Dr. Luxardo's account is supported by an EMG report performed at the Geisinger Medical Center in 1988 (R. 413) and DNA analysis performed by Athena Diagnostics in March of 2000. (R. 414-415). Dr. Luxardo attested that Plaintiff had negligible strength bi-laterally in her quadriceps muscles and weakness of her intercostal muscles and diaphragm. Dr. Luxardo regarded Plaintiff as unable to: (1) sustain a reasonable walking pace over a sufficient distance to carry out activities of

daily living; (2) travel without companion assistance to work; (3) walk even one block at a reasonable pace over rough or even surfaces; (4) use standard public transportation; and (5) stand and/or walk six-eight hours daily on a long term basis. He also indicated that Plaintiff could climb one flight of steps with difficulty and could occasionally lift or carry objects weighing less than ten pounds. Plaintiff was described as being incapable of climbing or performing overhead work. (R. 416-423).

On April 6, 2016 Dr. Luxardo completed a Residual Functional Capacity Form regarding Plaintiff. At that time Dr. Luxardo indicated that: Plaintiff had an unsteady gait; was easily fatigued; used a cane on a regular basis; could no longer run, squat, or kneel; had difficulty standing from a seated position in a chair without arms; and was experiencing chronic leg cramps. He diagnosed Plaintiff to be afflicted by SMA III. [1] He characterized

---

[1] "Spinal muscular atrophy is a genetic disorder characterized by weakness and wasting (atrophy) in muscles used for movement (skeletal muscles). It is caused by a loss of specialized nerve cells called motor neurons that control muscle movement. The weakness tends to be more severe in the muscles that are close to the center of the body (proximal) compared to muscles away from the body's center (distal). The muscle weakness usually worsens with age. There are many types of spinal muscular atrophy that are caused by changes in the same genes. … Spinal muscular atrophy type III (also called Kugelberg-Welander disease) typically causes muscle weakness after early childhood. Individuals with this condition can stand and walk unaided, but over time, walking and climbing

*(footnote continued on next page)*

SMA III as an incurable, progressive neurologic condition that would continue to deteriorate and likely result in Plaintiff ultimately needing a wheelchair. Dr. Luxardo stated that Plaintiff could not stand or sit upright for six to eight hours due to weakness, stiffness, cramping, instability and fatigue and that she must lie down most days to rest. Dr. Luxardo estimated that Plaintiff can lift or carry less than five pounds and that her condition impaired her ability to lift, pull, and hold objects. He indicated further that Plaintiff's SMA produced chronic pain in her muscles and joints that ranged in intensity from two to three up to five on a scale of ten. He found Plaintiff's complaints of pain to be very credible and linked to her SMA. Dr. Luxardo opined: "Her SMA has progressed to the point where she can barely care for herself, let alone work. And it is only going to get worse." He anticipated that Plaintiff would never return to work. (R. 425-430).

On June 28, 2017 Dr. Luxardo responded to post-hearing interrogatories from the ALJ. (R. at 465-467). He reiterated his findings as expressed in the previously mentioned reports and described further deterioration caused by "pain and weakness in her foot and ankle joints due

---

stairs may become increasingly difficult. Many affected individuals require wheelchair assistance later in life." nih.gov/condition/spinal-muscular-atrophy.

to the worsening muscle weakness in her thighs, hips, and surrounding foot muscles which lack the needed support. She cannot bend her left big toe, while her other toes rise up and curl and cause balance issues as well." Dr. Luxardo closed by stating:

> It is my medical opinion that Sandra is now permanently disabled. She can barely care for herself and accomplish her activities of daily living, let alone be a dependable employee. As her disease progresses her level of functioning will also continue to decline, irreversibly. Through the years that I have been caring for her, I have seen her decline. My nurses and I have to assist her into the office, assist her in getting on and off the exam table. She no longer even has the capacity to step onto the exam table step without help. Every day of her life is now a challenge. What most people take for granted, for her might be a significant obstacle. I feel that any doctor that reviews her chart and examines her, would agree that Sandra meets the criteria for disability.

**b.  Jay Willner, M.D.**

Dr. Willner saw Plaintiff once on April 9, 2015 in order to perform a consultative examination for the Bureau of Disability Determination. Dr. Willner stated that Plaintiff appeared to be in no acute distress, walked with her left leg taking a wide stance without her cane, was unable to walk on her heels and toes or squat, and needed assistance getting off the examination table and rising from a seated position. Dr. Willmer's neurologic examination disclosed significantly diminished deep tendon reflexes in Plaintiff's lower extremities, 5/5 strength in her right leg, and unquantifiable strength in her left leg due to her inability to lift that leg incident to a recent knee surgery. Dr. Willmer diagnosed spinal muscular atrophy and assessed that Plaintiff's prognosis was fair.

Dr. Willner completed a Medical Source Statement regarding Plaintiff's physical capacity for work-related activities. He found that Plaintiff: (1) could occasionally (up to one third of an eight hour day) lift up to fifty pounds and carry up to ten pounds; (2) sit without interruption for eight hours, stand without interruption for one hour, and walk without interruption for fifteen minutes; (3) sit for eight hours, stand for four hours, and walk for one hour in total in an eight hour workday; (4) never climb stairs, ramps, ladders or scaffolds, balance, stoop, kneel, crouch, or crawl due to her abnormal gait,

lack of balance and inability to squat; and (5) never be near unprotected heights due to her lack of balance. (R. 390-398).

### c. Dr. Scott M. Friedenberg.

Dr. Friedenberg is the Director of Neuromuscular Medicine and the EMG Laboratory at Geisinger-Bloomsburg Hospital. On August 21, 2015 he wrote a letter indicating that the Plaintiff "is currently under my care for the management of Spinal Muscular Atrophy (SMA), a genetic disease that affects the part of the central nervous system that controls voluntary muscle movement. With time, the disease causes muscles to weaken, making it difficult to walk, grip, breathe, swallow and control head movement." Dr. Friedenberg also indicated that there is no cure for SMA and he expressed a willingness to respond to further questions. Dr. Friedenberg did not comment on Plaintiff's physical capacities at the time of the examination. (R. 424).

### d. Justin A. Willer, M.D.

In March of 2016, Dr. Willer reviewed the medical records at the ALJ's request. Dr. Willer did not examine the Plaintiff. Dr. Willer executed a Medical Source Statement regarding Plaintiff's physical ability to perform work-related activities. (R. 456-464). He indicated that he could not assess Plaintiff's capacity to lift and carry because he had not seen notes from

treating neurologist Dr. Friedenberg. He could not assess Plaintiff's ability to stand and walk, ambulate without a cane, shop, travel without a companion, climb stairs, prepare meals, care for her personal hygiene, or perform clerical tasks for the same reason.

However, even without Dr. Friedenberg's notes, Dr. Willer was able to opine that Plaintiff: could sit for eight hours; reach, handle, push, and pull frequently; never climb stairs, ramps, ladders, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; never be exposed to unprotected heights; and could continuously be exposed to very loud noise. Dr. Willer expressed no opinion regarding when the limitations he identified had first appeared or how long they might last.

Dr. Willer also commented that Dr. Willner's assessment of 5/5 strength in Plaintiff's right leg does not conform to Dr. Luxardo's assessment of 0/5 strength in the same limb. Dr. Willer also opined that 0/5 strength in either leg is inconsistent with the ability to stand or ambulate to any extent.

## IV.  ALJ Decision.

The ALJ's decision was unfavorable to the claimant. The ALJ did find that Plaintiff has severe impairments in the form of spinal muscular atrophy and obesity. Despite these findings, the ALJ found that the Plaintiff has the residual functional capacity ("RFC") to perform sedentary work as defined in

20 C.F.R 404.1567 (a) "except she requires the option to alternate to standing for five minutes after every thirty minutes of sitting. A cane is required in the dominant hand to stand or walk and she must be able to alternate to sitting for five minutes after every twenty minutes of standing or twenty minutes of walking. She can occasionally reach overhead to the left and right. For all other reaching, she can reach occasionally to the left or to the right. The claimant can occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, occasionally balance, stoop, kneel, or crouch, and never crawl. She can frequently work at unprotected heights, around moving mechanical parts, in humidity and wetness, in dust, odors, or fumes, in vibrations, and in loud noise."

The ALJ also found that, while Plaintiff could no longer perform her past relevant work as a medical transcriptionist, she had acquired transferrable skills from her duties as a medical transcriptionist that permitted her to perform jobs that exist in significant numbers in the national economy such as information clerk, receptionist, and records clerk. Accordingly, the ALJ found the Plaintiff had not been under a disability from her alleged onset date. (June 20, 2013) through the date of his decision (May 26, 2017).

**V.    Disability Determination Process.**

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[2]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 CFR §§

_____

[2]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he is unable to engage in his past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R. at 28-29).

## VI.    Standard of Review.

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla". It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir.

1981).  The United States Court of Appeals for the Third Circuit further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence––particularly certain types of evidence (e.g., that offered by treating physicians)––or if it really constitutes not evidence but mere conclusion.  *See Cotter*, 642 F.2d at 706 ("Substantial evidence" can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear that it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, our Court of Appeals clarified that the ALJ

must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in her opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").

"However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## VII. Discussion

### A. General Considerations.

At the outset of this Court's review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, I note that the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial; rather the Social

Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

**B. Plaintiff's Allegations of Error**.

Plaintiff alleges that the ALJ made four legal errors that require reversal or remand of his decision. Having reviewed Plaintiff's brief, the Court concludes that the four errors alleged by Plaintiff coalesce into two errors: (1) an incorrect evaluation of the medical evidence; and (2) a residual functional capacity determination that is not supported by substantial evidence.

**1. Whether the ALJ properly evaluated the medical evidence?**

Plaintiff asserts that the ALJ improperly assigned "limited weight" to the opinion of the treating physician, Dr. Luxardo, while according "great weight" to the opinion of Dr. Willer, whose opinion was based only upon his review of her medical records. It is axiomatic that a treating physician's opinion is generally entitled to great weight. See, e.g., *Fargnoli v. Massanari,* 247 F.3d. 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527 (c)(2); See also *Cotter v. Harris*, 642 F.2d 700, 704 (3d. Cir. 1981). Section 404.1527 (c)(2) addresses the weight to be given a treating source's opinion:

> If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's medical opinion controlling weight. … we will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion.

In this case, the ALJ gave "great weight" to the opinion of a non-examining source (Dr. Willer), "partial weight" to the opinion of a

consulting/examining physician (Dr. Willner), and "limited weight" to the opinion of the treating physician (Dr. Luxardo). Thus, the normal order of priority of medical opinions has been reversed here. Such a result is permissible in a context where the treating physician's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. Yet, having thoroughly reviewed the medical records in this case, the Court concludes that the ALJ's evaluation of the medical evidence is not supported by the requisite substantial evidence.

It is true that there is less medical documentation from the treating physicians (Drs. Luxardo and Friedenberg) than one normally sees in a social security disability appeal. Nevertheless, Dr. Luxardo thrice strongly indicated his conviction that Plaintiff is incapable of any form of gainful activity. Dr. Luxardo's diagnosis of SMA III is well supported by objective testing and the ALJ has conceded as much by finding that Plaintiff has a severe impairment in the form of spinal muscular atrophy. (R. at 20). Dr. Friedenberg concurred in the diagnosis, discussed the dire progression of the disease, and invited further questions which the ALJ never posed.

Rather than explore Plaintiff's limitations further by requesting the treatment notes of Dr. Luxardo or Dr. Friedenberg, the ALJ chose to place

primary reliance on a consultative report prepared by Dr. Willer, who never examined Plaintiff. Despite the obvious disadvantage of having had no opportunity to personally observe the claimant and his spontaneous admission that he could not assess Plaintiff's capacity to perform numerous tasks (e.g. lift; carry; perform such activities as shopping, traveling without companions, ambulate without using a walker, cane, or crutches; walk a block at a reasonable pace; use public transportation; climb a few steps at a reasonable pace; or take care of her personal hygiene) without seeing the treating physician's progress notes, Dr. Willer opined that Plaintiff could occasionally balance, stoop, kneel, crouch, and crawl. It strains credulity to find consistency in these obviously contradictory conclusions. Further undermining Dr. Willer's conclusion is his acknowledgment that he lacked sufficient objective medical and other evidence to allow him to form an opinion about the nature and severity of Plaintiff's impairments during the relevant time period. (R. at 461). Given this acknowledgment, the ALJ's decision to accord "great weight" to Dr. Willer's report is clearly erroneous. For that reason, Plaintiff's first assignment of error must be credited.

### 2. Whether the ALJ's RFC determination is supported by substantial evidence?

Plaintiff asserts that the ALJ erred in formulating his RFC determination. That determination included the notion that Plaintiff can

occasionally (up to one-third of the time) stoop. That notion finds no medical support in the record. Significantly, Plaintiff points out that SSR 96-9p states:

> An ability to stoop occasionally, i.e. from very little up to one-third of the time, is required in most unskilled sedentary occupations. A complete inability to stoop would significantly erode the unskilled sedentary occupational base and the finding that the individual is disabled would usually apply.

(Doc. 7 at 11).

This regulation is particularly germane because Plaintiff's testimony that she can never stoop (R. at 56) is corroborated by Dr. Luxardo (R. at 428) and Dr. Willner (R. at 397). Dr. Willer's assessment that she can occasionally stoop is unreliable because he never saw the Plaintiff and because of his previously discussed acknowledgment (R. at 461) that he had not seen sufficient medical evidence for him to form an opinion about the nature and severity of Plaintiff's impairments. Thus, the only unequivocal medical evidence in the record supports the conclusion that Plaintiff cannot stoop. Accordingly, that portion of the ALJ's RFC determination that indicates Plaintiff can occasionally stoop is unsupported by substantial evidence. This, in turn, means that the hypothetical question which prompted the VE to

conclude that Plaintiff could perform various jobs did not take into account all Plaintiff's credibly established impairments. It is axiomatic that an ALJ must include within a hypothetical question all of Plaintiff's credibly established limitations. *Zirnsak v. Colvin*, 777 F.3d 607, 614 (3d. Cir. 2014); citing *Plummer v. Apfel,* 186 F.3d. 422, 431 (3d. Cir. 1999).

Because the ALJ's hypothetical question to the vocational expert was defective, it is impossible to determine whether the jobs identified by the vocational expert as being within Plaintiff's abilities would remain so had all her impairments been made known to the VE. Accordingly, the VE's conclusion that Plaintiff could function as a receptionist, information clerk, or records clerk is unsupported by substantial evidence. Thus, Plaintiff's second assignment of error must also be credited.

## VIII.  Conclusion.

This chronically ill woman who is afflicted by a disease which, according to all the medical evidence, will inexorably worsen as she grows older, has been waiting for a decision in this case since 2015. One of her treating physicians has opined unequivocally that she has been disabled since her alleged onset date. The Agency has produced no substantial evidence to refute that treating physician's opinion and, in derogation of its duty to fully develop the record, has elected not to solicit clarifying

information from either of her treating physicians. The Court must regard the ALJ's failure to do so as a disturbing indifference to the Agency's duty to develop the record fully as required by *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995).

The inevitability of Plaintiff's deterioration combined with the glacial pace at which these cases typically progress convinces this Court that merely remanding this case for further evaluation by the Agency would be unjust. This is more particularly so because the record obviously contains substantial evidence - - that amount of evidence that a reasonable mind might accept as adequate to support a conclusion - - of Plaintiff's disability. Accordingly, the ALJ's decision will be reversed and the Agency will be directed to award Plaintiff disability insurance benefits. An Order to that effect will be filed contemporaneously.


*s/Malachy E. Mannion*
Malachy E. Mannion
United States District Judge


Dated: April 23, 2019